IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

In re: JESS K. JONES, Debtor                                No. 5:10-bk-76112
                                                            Ch. 7


CARRIER SALES AND DISTRIBUTION, LLC                         PLAINTIFF

v.                        No. 5:11-ap-07021

JESS K. JONES                                               DEFENDANT


## OPINION

Before the Court is the complaint of Carrier Sales and Distribution, LLC [Carrier] alleging that the debtor, Jess K. Jones [Jones], is personally liable on the debt owed to Carrier by Jones's former business, Advanced Air, Inc. [Advanced Air]. In addition, Carrier alleges that this debt is nondischargeable pursuant to § 523(a)(2), § 523(a)(4), and § 523(a)(6). For the reasons stated in this opinion, the Court finds that although Jones is personally liable on the debt, Carrier failed to prove by a preponderance of the evidence each of the elements required under § 523(a)(2), (a)(4), or (a)(6). Accordingly, Carrier's request for relief under these code sections is denied and the debt is eligible for discharge.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052 and 9014.

## BACKGROUND

Jones and his now former wife each owned 50 percent of Advanced Air, a heating and air conditioning business that was managed and operated by Jones. Advanced Air provided services for residential and business customers as well as installation of heating and air

conditioning systems for commercial building projects. The number of employees fluctuated according to Advanced Air's work load--the greatest number of employees at one time was 135. Jones oversaw the business and made all major decisions on Advanced Air's behalf: which jobs to take, and which bills to pay and when. Certain duties, including bidding on jobs, day-to-day management of those jobs, negotiating payments, and handling billing matters, were delegated in large part to managers and other employees. His former wife was not involved in the operation of the business and was rarely present at Advanced Air's office.

The debt at issue in this matter arose from a building project for the First Baptist Church of Rogers [FBC project] in which Advanced Air was a sub-contractor for whom Carrier supplied materials for the job. A third party, CDI, Inc. [CDI], was the general contractor. Jones and witnesses for Carrier, based on their experience with other building projects, agreed that at regular intervals as a project proceeded, it was customary for the general contractor to require the sub-contractor to obtain a lien release and waiver from the supplier before the general contractor would disburse funds to the sub-contractor for payment. Once the supplier waived its lien on materials, payment for the materials then passed from the general contractor to the sub-contractor, who then paid the supplier. The same process was to be followed for the FBC project--once Carrier executed the lien release and waiver, CDI disbursed funds to Advanced Air to be paid to Carrier for the cost of the materials Carrier had previously supplied to Advanced Air for the FBC project.

This method of payment had been established between the parties for other building projects done prior to and concurrently with the FBC project. In addition, a number of payments were paid in full to Carrier for the FBC project.[1] Apparently following this

---

[1] Payment from Advanced Air to Carrier did not always go smoothly--both for the FBC project and prior projects, payments were sometimes late and at least once, a payment plan had to be arranged.

course of dealing, on January 14, 2010, Teri Griffin (a former employee of Carrier) signed the form provided by CDI entitled "Release and Waiver of Lien by Suppliers of Labor or Material" on behalf of Carrier in the amount of $118,538.23. While not true, the lien waiver signed by Griffin stated that Carrier had already received $118,538.23 as consideration for the lien release.[2] In addition, and unknown to Carrier at the time the lien release was executed, CDI had already paid Advanced Air the $118,538.23 in December 2009. Neither party could explain why CDI, in contravention of its usual payment procedure, released funds to Advanced Air before Carrier executed the lien release in January 2010. Likewise, no explanation was offered why Advanced Air did not pay Carrier upon receipt of the funds in December 2009.

After the lien release was executed, Carrier did not receive its payment from Advanced Air. In February 2010, within one month of the lien release being executed, Advanced Air closed its doors. Jones stated that despite his intentions to keep the company open, the decision to close Advanced Air in February 2010 was necessary when he learned that an unexpected shortfall in funds would prevent Advanced Air from continuing to make payroll to its employees.[3] In a last effort to prevent Advanced Air from closing, Jones attempted but failed to acquire loans from two separate banks with which he was in good standing. Jones also testified that Advanced Air had been able to work through difficult financial times in the past, but that as of February 2010, the business could not be

---

2 In Griffin's deposition, which was entered into evidence, she stated that Carrier's policy was to generate its own lien waiver forms that included language that conditioned release of any liens upon Carrier's receipt of payment. This conditional language ensured that if payment failed, Carrier's material lien(s) would remain in effect. However, CDI required suppliers to use a lien waiver form that it provided. In contrast to Carrier's form, CDI's lien waiver form contained no language conditioning release of liens on successful payment and also made the incorrect statement that Carrier had already been paid. According to Griffin, CDI did not permit Carrier to insert additional language to qualify these terms or reserve its lien if payment was not made.

3 Jones testified that the week Advanced Air was closed, he had learned that the business would not receive an expected accounts receivable payment of $245,000.00.

sustained.

**ANALYSIS**

Carrier argues that Advanced Air was Jones's alter ego, and that he is, therefore, personally liable for Advanced Air's debt. Arkansas courts have determined that "[t]he conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case." *Humphries v. Bray*, 611 S.W.2d 791, 793 (Ark. Ct. App. 1981). After conducting a review of cases, the Eighth Circuit concluded that Arkansas courts are reluctant to establish a rigid test regarding when application of the alter ego theory is proper: some Arkansas courts have required evidence of wrongdoing, while other Arkansas courts have emphasized that an illegal abuse of the corporate form to the detriment of a third party is sufficient. *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 935 (8th Cir. 1999). Illegal abuse of the corporate form was sometimes found to have occurred where a party failed to respect the separateness of the corporate entity. *Id.*

The facts before the Court show that Jones failed to respect the separateness of the corporate form of Advanced Air. Jones testified that he had not kept a separate personal checking account--instead, his family's bills and expenses were paid through Advanced Air's bank accounts. In an e-mail entered into evidence, Jones stated that "[t]he majority, if not all, electric, gas, phone, water, vehicles, Medical, mortgages on personal home, [and] insurance was paid through Advanced bank accounts at Arvest and Bank of Arkansas accounts from 1995-2010." Bank records for an Advanced Air account for the months of June 2009 through December 2009 show monthly checks written for personal expenses such as country club membership dues, private school tuition for several of Jones's children, substantial tithes to their church and other charitable donations, "petty cash" to Jones, and non-enumerated expenses for his wife. In December 2009 alone, Jones wrote the following checks from the Advanced Air bank account for what appear to be personal purposes: $11,000.00 total to his wife, $670.23 to Warren Shoes, $2,786.39

4

to Best Buy, $1,007.86 to Lewis & Clark, $531.09 to the Razorback Shop, $4,200.00 to Blakeman's Jewelry Store, $5,451.00 to Shiloh Christian School, and several thousand dollars more in charitable donations. In the same month, Jones drew additional funds from this account for family expenses: the home mortgage payment and utilities, payments for vehicles such as his wife's Cadillac and her son's H3 Hummer, gasoline for those vehicles, and other personal expenses.[4]

In a case with similar facts, the Eighth Circuit upheld a lower decision that determined that the sole shareholder's corporation was his alter ego where the shareholder paid for several vehicles, personal merchandise, and services through the corporation's accounts. *Id.* In addition, the shareholder received a disproportionately inflated income from the shareholder's company even while the company was suffering financially. Like in that case, Jones was aware as early as 2008 that Advanced Air was facing serious financial hardship. He testified that Advanced Air experienced losses of more than one million dollars in 2008 and $119,000.00 in 2009 because of the economic slump that affected the construction industry. Even so, Jones and his family drew directly and freely from Advanced Air's bank accounts for all of their personal expenses. While Jones's 2009 personal income tax returns show that he was receiving a salary of only $49,402.00 and dividends of $8,435.00 in 2009, the bank records indicate that far more of Advanced Air's funds were used to support his family even while the business was severely struggling (it appears that the debtor spent, at a minimum, $26,000.00 for personal expenses in December 2009 alone). For these reasons, the Court finds that Jones failed to respect the corporate form of Advanced Air as a separate entity, and that Advanced Air was actually Jones's alter ego. Therefore, the Court finds that Jones is personally liable on Advanced Air's debt owed to Carrier.

---

4 The exact amount of Advanced Air funds used by Jones and his family in December 2009--or any other month--cannot be determined based only on a review of bank statements and copies of cancelled checks. Notations on the checks are insufficient to distinguish between business and family expenses, and the purpose of extensive withdrawals of cash and debits is similarly inscrutable.

With the debt established as being owed by the debtor to Carrier, the Court must determine whether this debt is nondischargeable under § 523(a)(2), (a)(4), or (a)(6) as alleged by Carrier. These sections will be discussed, in turn, below.

      a. SECTION 523(a)(2)(A)

Section 523(a)(2)(A) states that a discharge is not available to a debtor for any debt for money, property, or services obtained by "false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition." A party challenging the dischargeability of a debt under this code provision has the burden of proving by a preponderance of the evidence five elements:

1. that the debtor made a representation;
2. that at the time the debtor knew that the representation was false;
3. that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor;
4. that the creditor justifiably relied on such representation; and
5. that the creditor sustained the alleged loss and damage as a proximate result of the representation having been made.

*Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (citing *Thul v. Ophaug* (*In re Ophaug*), 827 F.2d 340 (8th Cir. 1987)). Unless there is sufficient proof by a preponderance of the evidence as to each element, a court cannot find for the plaintiff.

The false representation alleged to have been made by Jones and Advanced Air to Carrier appears to be based on two theories. First, at the time that Advanced Air entered into the contract with Carrier for the FBC project, Advanced Air did not disclose to Carrier its financial losses in 2008 and 2009. Carrier suggests that had it known of Advanced Air's financial condition, it may not have agreed to supply materials for the FBC project. Second, at the time that Carrier executed the lien release on January 14, 2010, Advanced Air had already received the funds from CDI to pay Carrier. Advanced Air did not pay

6

Carrier from those funds at the time the funds were received, or later, after Carrier executed the lien release. Carrier alleges that it would not have signed the lien release if it had known that Advanced Air already had received the funds in December and the extent of Advanced Air's financial troubles. Both alleged misrepresentations rely on Jones's failure to inform Carrier of Advanced Air's finances. "'[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression.'" *Moen*, 238 B.R. at 791 (quoting *In re Malcolm*, 145 B.R. 259, 263 (Bankr. N.D.Ill. 1992)). Silence regarding a material fact may rise to the level of a false representation by false pretenses under § 523(a)(2)(A). *Id.*

Regarding the first alleged misrepresentation, there is no evidence that Jones purposefully withheld financial information from Carrier at the time the parties entered into the FBC project contract in early 2009 with the intent to deceive Carrier. Carrier did not ask Jones or Advanced Air for updated financial information at the time they entered into the FBC project contract, or, in fact, at any time after their initial contract in 2004, at which time Jones, on behalf of Advanced Air, had signed a credit agreement with Carrier.[5] That initial credit agreement, which appears to have functioned as an ongoing agreement over the course of several years and multiple projects between Carrier and Advanced Air, specifically authorized Carrier to obtain oral or written credit reports. The credit agreement also stated that the authorization was "continuing in nature" and could be extended to "any update, renewal, or extension of credit under this agreement."[6] Based on Carrier's apparent access to Advanced Air's financial information, there is nothing to

---

[5] Jones testified that Advanced Air provided financial information to vendors at their request, but that Carrier never asked for additional information.

[6] The credit agreement provided for a credit limit of up to $25,000.00. By the time the parties entered into the FBC project contract in 2009, the amount of credit Carrier extended to Advanced Air was significantly more (and had been on previous jobs as well).

suggest that Jones's or Advanced Air's failure to disclose to Carrier its recent financial losses at the time the parties entered into the FBC project contract was a false pretense under § 523(a)(2)(A).

In relation to the second alleged misrepresentation involving the lien release, Carrier may have relied to its detriment on the assumption that once it executed the lien release, CDI would release funds to Advanced Air to pay to Carrier. The fact that CDI already had paid the funds to Advanced Air in December 2009 was material and unknown to Carrier at the time it executed the lien release in January 2010. Carrier sustained damages in the amount of $118,538.23 as a result of having no recourse once its lien was released and Advanced Air failed to pay Carrier. However, the Court cannot find that Carrier succeeds under § 523(a)(2)(A) because it lacks evidence of Jones's intent to deceive Carrier.

Jones testified that he was not personally involved in the lien release process. At the time Advanced Air closed in February 2010 and within a month of the lien release being executed, Jones estimated that the business had 60-70 employees and hundreds of jobs, including 15 major commercial projects. Responsibilities such as billing, which included draw (payment) requests to CDI as well as the corresponding lien waivers from suppliers, were handled by Advanced Air's commercial manager Jay Ray. While Jones supervised Ray and met with Ray at least weekly to discuss jobs such as the FBC project, Jones stated he was not personally aware of Carrier's lien release or the problems that arose from it until after Advanced Air closed. There is no evidence that Jones personally knew that CDI had already paid Advanced Air at the time that Carrier executed the lien release in January 2010. In addition, the evidence is not clear what communication, and by whom, passed between Advanced Air and Carrier incident to this particular billing.[7] The

---

[7] The evidence shows that Jay Ray or his assistant, Diane Stephenson, had communicated with Griffin at Carrier regarding previous lien releases for the FBC project. In relation to Carrier's lien release executed on January 14, 2010, Griffin stated that a CDI representative had told her earlier in January that Diane Stephenson would be sending her a lien release form. However, that is the extent of the Court's knowledge of

problem arose when CDI paid funds to Advanced Air before it received the lien release for this particular draw request.[8] Advanced Air had hundreds of jobs at that time and Jones testified that the business received checks daily. A review of Advanced Air's bank account shows that large amounts of money flowed into the account on a monthly basis. For example, in October 2009, deposits totaled $744,082.12; in November 2009, deposits totaled $672,101.23; and in December 2009, deposits totaled $1,170,994.40. Based on the significant ebb and flow of funds into the account, the Court can understand why no one at Advanced Air recognized that Advanced Air was paid before the lien release was executed. Apparently, CDI did not realize this either because it disbursed funds to Advanced Air without the required lien release. For these reasons, the Court cannot find that Jones withheld from Carrier the material fact of CDI's prior payment to Advanced Air with the intent to deceive Carrier.[9]

Carrier argues that even without scienter, or intent, the Court can find that the debt owed to Carrier is nondischargeable under § 523(a)(2)(A) based on a finding of constructive fraud. Constructive fraud "has been defined as the making of misrepresentations by one who, not knowing whether [the representations] are true or not, asserts them to be true without knowledge of their falsity and without moral guilt or evil intent." *S. County, Inc.*

---

the parties' interaction regarding this lien release.

  8  There is no evidence that CDI made any other payment to Advanced Air prior to Carrier executing a lien release. For this reason, the facts here appear to be an anomaly.

  9  The Eighth Circuit Court of Appeals recognizes that fraudulent acts committed by a debtor's agent may be imputed to the debtor for purposes of finding a debt nondischargeable under § 523(a)(2)(A). *In re Walker*, 726 F.2d 452, 454 (8th Cir. App. 1984). A debtor's actual participation in fraud committed by his agent is not required; the act and intent necessary under § 523(a)(2)(A) may be imputed to the debtor if he knew or should have known of his agent's culpable behavior. *Id.* However, there is no evidence that Jones, with the requisite intent, had Ray make a false representation to Carrier, or even that Ray independently made a false representation to Carrier with the intent to deceive. Ray did not testify at the hearing, and it is unknown how extensively Ray was personally involved in Carrier's execution of the lien release.

*v. First W. Loan Co.*, 871 S.W.2d 325, 327 (Ark. 1994).  However, § 523(a)(2)(A) recognizes only actual fraud--and not constructive fraud--as a basis for nondischargeability of a debt.[10]  *Ophaug*, 827 F.2d at 342, n.1.  The requirement of actual fraud for finding a debt nondischargeable reiterates that the debtor must have known the representation was false and acted with the intent to deceive.  *Am. Title Ins. Co. v. Gramolino* (*In re Gramolino*), 183 B.R. 565, 567 (Bankr. E.D. Mo. 1995).  While Jones may have been negligent in his failure to oversee the financial transactions within Advanced Air, this does not rise to the level of knowledge and intent required under § 523(a)(2)(A).

Because Carrier failed to prove by a preponderance of the evidence that Jones made a false statement with the intent to deceive Carrier, the Court denies its request for relief under § 523(a)(2)(A).

### b. SECTION 523(a)(4)

Carrier also asks the Court to find that Jones's debt owed to Carrier is nondischargeable under § 523(a)(4).  Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  Carrier's closing arguments made in its post-trial brief focus solely on Jones's alleged fraud or defalcation committed while he acted in a fiduciary capacity, and so the Court will not extend its analysis to consider embezzlement or larceny.

For a court to find that a debtor incurred a debt by fraud or defalcation while acting in a fiduciary capacity, there must have been an express or technical trust in place at the time

---

[10]    Carrier cites to another opinion by this Court, *Graham v. Ensign* (*In re Ensign)* 2011 Bankr. Lexis 1131 (March 25, 2011 Bankr. W.D. Ark.), for the proposition that constructive fraud is applicable under § 523(a)(2)(A).  The issue in that case, however, was to what extent the Court was collaterally estopped from making a determination of elements required under § 523(a)(2)(A) that overlapped with elements in the state court's finding of constructive fraud.

that the debt was incurred. *Tudor Oaks Ltd. P'ship v. Cochrane* (*In re Cochrane*), 124 F.3d 978, 984 (8th Cir. 1997). As the Eighth Circuit Bankruptcy Appellate Panel recently reiterated, the kind of fiduciary relationship contemplated by § 523(a)(4) is narrow in scope. *Arvest Mortg. Co. v. Nail* (*In re Nail*), 446 B.R. 292, 300 (B.A.P. 8th Cir. 2011). A contractual relationship alone does not establish a fiduciary relationship as required under § 523(a)(4). *Chao v. Gott* (*In re Gott*), 387 B.R. 17, 22 (Bankr. S.D. Iowa 2008) (citing *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir. 1993)). In addition, "[t]he broad general definition of fiduciary–a relationship involving confidence, trust and good faith–is inapplicable." *Nail*, 446 B.R. at 300 (quoting *Jafarpour v. Shahrokhi* (*In re Shahrokhi*), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001)). Carrier suggests that the combination of the fiduciary duty owed by an officer or stockholder to a corporation and a bankruptcy court's general equitable powers is sufficient to create an equitable fiduciary relationship between Jones and Carrier. However, Carrier presented no evidence of either an express or technical trust, and the Court is unaware of any statute or circumstance that establishes the kind of fiduciary relationship required under § 523(a)(4). Accordingly, the Court finds that Carrier did not meet its burden of proof, and the Court denies Carrier's request for relief under § 523(a)(4).

    c. SECTION 523(a)(6)

Finally, Carrier asks that the debt owed to it by the debtor be found nondischargeable under § 523(a)(6), which excepts from discharge a debt resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity." As the moving party, Carrier must prove by a preponderance of the evidence that the injury that occurred was both a willful injury and a malicious injury. *Sells v. Porter* (*In re Porter*), 539 F.3d 889, 893 (8th Cir. 2008). A willful injury occurs where the debtor intended the injury, or where the debtor knew that his acts were certain, or substantially certain, to result in the injury. *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180-81 (8th Cir. 2008) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 58 (1998) ("nondischargeability takes a deliberate or intentional *injury*, not merely . . . a deliberate

or intentional *act* that leads to injury.")).  Injury that results from the debtor's reckless or negligent actions does not rise to the level of a willful injury.  *Geiger*, 523 U.S. at 61.  A malicious injury occurs where the debtor *targeted* the creditor with the intent to harm–or at least with substantial certainty that financial harm would occur.  *In re Long*, 774 F.2d 875, 881 (8th Cir. 1985).

The Court finds that Carrier's injuries were neither willful nor malicious.  Jones was aware of the precarious condition of the business in the months prior to February 2010.  His decision to pay large family expenses, make generous charitable donations, and gift more than $13,000.00 to employees for holidays at the end of 2009 while Advanced Air struggled probably jeopardized Advanced Air's ability to pay its debts.   However, while Carrier may have been injured as a result of Jones's actions, it was not a "willful injury" as contemplated by § 523(a)(6).  Jones freely conceded that the company accounts were used to pay family expenses from 1995 to 2010, and Advanced Air's bank records for June 2009 through February 2010 show that Jones was consistent in his use of Advanced Air funds.   Jones's statement that he proceeded with "business as usual" indicates an element of recklessness, in the light of Advanced Air's financial struggles.  However, injury resulting from reckless acts does not rise to the level of a willful injury.  While Jones's spending ultimately resulted in less money to pay Advanced Air's debts, Carrier has not demonstrated that Jones knew or was substantially certain that his spending would result in Carrier not being paid.   In addition, Carrier has not met its burden of proving that Jones acted with the specific purpose of harming Carrier.  The Court believes Jones when he testified that he intended to fight through the economic slump and closed Advanced Air only when faced with an insurmountable financial crisis.  For these reasons, the Court finds that Carrier did not meet its burden of proving both a willful injury and malicious injury as required under § 523(a)(6).

 **CONCLUSION**

For the foregoing reasons, the Court finds that Carrier failed to prove by a preponderance

of the evidence all required elements under § 523(a)(2), (a)(4), and (a)(6). Accordingly, Jones's debt, incurred by Advanced Air and for which Jones is personally liable, is subject to discharge.

IT IS SO ORDERED.

/s/ Ben Barry
Ben Barry
United States Bankruptcy Judge
Dated: 09/28/2012